PEOPLE v. MARTINO.

1. CRIMINAL LAW—NONJURY CASE—WEIGHT OF EVIDENCE—CREDI-
BILITY.
    In a prosecution for crime, tried by the court without a jury,
    where the testimony offered by the prosecution and the de-
    fendant is conflicting, the conviction should not be disturbed
    as the trial court must weigh the testimony and determine its
    credibility, unless the Supreme Court can say that the testi-
    mony did not establish the defendant's guilt beyond a reason-
    able doubt.

2. SAME—LARCENY BY CONVERSION—SUFFICIENCY OF EVIDENCE—
OTHER OFFENSES.
    In prosecution for larceny by conversion, evidence held, suf-
    ficient to establish defendant's guilt beyond a reasonable
    doubt, where defendant's testimony is replete with contra-
    dictions and during many years' absence from jurisdiction he
    had been convicted of other crimes before being apprehended
    for prosecution herein (3 Comp. Laws 1929, § 16911).

STARR, SHARPE, and BOYLES, JJ., dissenting.

Appeal from Recorder's Court for City of De-
troit; Murphy (George B.), J.   Submitted January
13, 1944.   (Docket No. 76, Calendar No. 42,147.)
Decided April 3, 1944.   Rehearing denied May 17,
1944.

Carmine J. Martino was convicted of larceny by
conversion.  Affirmed.

*Joseph A. Cassese,* for appellant.

*Herbert J. Rushton,* Attorney General, *Edmund
E. Shepherd,* Solicitor General, *William E. Dowling,*

Prosecuting Attorney, and *Edward A. Elsarelli* and *Harold Helper,* Assistant Prosecuting Attorneys, for the people.

STARR, J. (*dissenting*). In March, 1942, defendant was convicted under an information charging that in June, 1931, he "feloniously and fraudulently did embezzle and convert to his own use" $480 belonging to the complaining witness, Carlo Migliori.

3 Comp. Laws 1929, § 16911 (reenacted by Act No. 328, § 362, Pub. Acts 1931 [penal code], effective September 18, 1931 [Comp. Laws Supp. 1940, § 17115–362, Stat. Ann. § 28.594]), provides:

"If any person to whom any money, goods, or other property which may be the subject of larceny, shall have been delivered, shall embezzle or fraudulently convert to his own use, or shall secrete with the intent to embezzle, or fraudulently use such goods, money, or other property, or any part thereof, he shall be deemed by so doing to have committed the crime of larceny."

In 1931 defendant was a stockholder, director, general manager, and president of the United Credit Protective Service Corporation (herein referred to as the corporation) which had offices in Detroit and was engaged in the collection service business. The complainant Migliori, who conducted a grocery store in Detroit, claimed in substance that he paid defendant $500 with which to purchase stock of the corporation and that defendant fraudulently converted the money to his own use. Defendant denied that he received the money, and claimed that Migliori paid it to the corporation and that certificate for $500 of stock was issued and delivered to him.

Upon trial without a jury defendant was convicted and sentenced to from one to five years. His motion for a new trial was denied, and he appeals,

contending that there was no proof of felonious intent and that his conviction was against the great weight of the evidence.

In April, 1931, Migliori had entered into a written contract with the corporation for its collection services and paid $20 on the contract. He testified regarding the contract and the purchase of stock and payment therefor in part as follows:

"On June 5, 1931, I gave the defendant $500. First I give him $20 to collect my account at the store. He came back and asked me, 'Why don't you buy share?' * * * I give him $500 to buy share in stock. * * *

"*The Court:* * * * You gave him $500. Did he give you some stock back?

"*A.* He give me nothing.

"He did not return the $500. I don't see him any more. He run away. * * *

"*Q.* Did Mr. Martino give you credit for the $20 that you paid for this service?

"*A.* Yes. * * *

"After I gave Martino the $480, or $500, I received a note signed by Mr. and Mrs. Martino. * * *

"*Q.* Did you go to Mr. Martino and tell him you wanted a note signed by him and his wife to cover this money that you bought stock with?

"*A.* Yes."

The testimony and exhibits indicate that Migliori paid $50 on May 14, 1931, and $430 on June 5, 1931, which, together with the $20 paid on the collection service contract, made a total of $500. The corporation issued and delivered to Migliori its receipt for the $50 payment, which stated, "to be applied on 20 shares of stock he (Migliori) is purchasing," and its receipt for the $430 payment, which stated, "balance due on 20 shares stock certif. now paid in full."

Defendant testified regarding the payments by Migliori and the issuance of stock in part as follows:

"We sold a collection service to people with charge accounts. I, or someone in our organization, sold such a service to Carlo Migliori. The fee was $20. * * * Mr. Migliori agreed to purchase 100 shares of stock equivalent par value at the time $25 a share. Later he changed his mind and subscribed for 20 shares of stock at $25 a share or $500. He paid, I believe, $50 to our cashier and partner, Miss Frances Smith. He insisted that the $20 which he paid Mr. Nero for the collection membership be credited on account of the purchase of the stock, so he paid $480 in all, outside of the $20 aforementioned. I signed the receipts. * * * They cover the money that was turned over by Mr. Migliori to the cashier. * * * I was present when this money was paid and represented the balance for the 20 shares. These shares were delivered to Mr. Migliori the same day, June 5th, the day he paid the full balance for the 20 shares. * * *

"Miss Frances Smith was in charge of all books and she kept them in a special compartment of her desk. When she received the balance of the entire transaction of $500, I called her to bring the stock book and I issued a certificate for 20 shares payable to Mr. Carlo Migliori at the same date. I am sure that I actually tore it out of the stock book and handed it to him. I wrote on the stub that remained a part of the company record. * * * First, I wrote the amount of the shares, second, the name of the party issued to, and third, the date and when the certificate was issued to the party named. * * * There was * * * a documentary stamp placed on this stock. * * *

"Frances Smith was our cashier. She made out this receipt. She handled the cash and the deposits in the bank and she had charge of that. Migliori didn't come in and give me the money—he paid Miss Smith and she gave the receipt."

Defendant further testified that when he resigned as an officer and manager of the corporation in Au-

gust, 1931, he transferred his entire holdings to Mr.
Nero; that the corporation at that time made up a
new set of books; and that he took the old stock
certificate book, bank book, and cancelled checks and
deposited them in the vault in his attorney's office
for safekeeping. Such testimony was corroborated
by that of his attorney. A stock certificate stub,
which was put in evidence, purported to show that
certificate No. 13 for 20 shares was issued to ''Carlo
Migliori, Director,'' June 5, 1931. A duly cancelled
Federal revenue stamp in the amount of 25 cents
was affixed to said certificate stub. The stub also
bore on its face the notation ''canceled July 10,
1931.'' Defendant said he made the notation when
he repurchased the $500 of stock from Migliori on
July 10th and gave him the following agreement or
note:

''Detroit, Mich., July 10, 1931. Agreement:
''The undersigned having received as a loan from
Mr. Carlo Migliori the sum of $2,500 to be paid in
90 days, hereby authorize Mr. Migliori that in case
said money is not paid within 90 days, to take legal
actions against Martino and to attach whatever
property or anything of value belonging to Martino
either in America or Italy.
''The undersigned also declare not to take any
defenses for the payment of said loan.
''Signed: CARMINE J. MARTINO,
''JOSEPHINE F. MARTINO.''

Defendant claimed that the above agreement cov-
ered $1,500 which Migliori loaned him, the $500 pay-
ment for the repurchase of the stock in question, and
a bonus of $500. He testified in part regarding the
agreement and his repurchase of the Migliori stock:

''When I gave the note to Mr. Migliori, I asked
for him to return the stock certificate. He told me
* * * that when that note would be paid to him,

.he would be only too glad to return the stock certificate to me. For my own protection, I cancelled the stub. * * *

"He retained possession of the stock certificate and as far as I know he still has it. * * *

"I gave Mr. Migliori * * * the note or agreement (of July 10, 1931), showing I owed him $2,500, because, shortly after he received a stock certificate he was willing to loan me an additional amount of money, personally. He told me that he didn't want to bother with stocks— * * * he wanted the money back,—the $500. * * * He was willing to give me an additional $1,500, plus the $500 that he had already paid for the 20 shares of stock, providing I would give him my note written in English and Italian for $2,500. * * *

"I gave him the agreement later in spite of the fact that he had the certificate."

Migliori testified in substance that he never received the certificate for $500 of stock; that the agreement or note of July 10, 1931, did not cover the repurchase of the stock; and that the agreement related to another and separate transaction whereby he loaned money to defendant to establish certain business branches. It appears that the business of the corporation was continued for several months after defendant left the State in September, 1931, and that he was absent from the State for a number of years preceding his arrest on the present charge in 1942.

Under the statute hereinbefore quoted, it was incumbent on the prosecution to show that the $480 in question was delivered to defendant personally, either by Migliori or the corporation, and that he converted it to his own use "with the intent to embezzle, or fraudulently use" the same. The prosecution based its case principally on Migliori's uncorroborated testimony that he paid defendant $500

with which to purchase stock and that defendant did not deliver the stock to him. The defendant, in effect, denied receiving the money personally and claimed that Migliori paid it to the corporation, which issued and delivered stock certificate to him. If this conflicting testimony were the only evidence, we would be disposed to affirm defendant's conviction, as the trial court, sitting without a jury, saw and heard the witnesses and could judge their credibility. *People* v. *Hepner,* 285 Mich. 631; *People* v. *Beath,* 277 Mich. 473.

However, certain written instruments were presented in evidence which tended to negative Migliori's testimony. The corporation's written receipts for the $50 and $430 payments indicated that the money was not paid to defendant personally, but was paid to the corporation. There was no showing that defendant received such money from the corporation. Migliori's statement that he did not see defendant after he paid him the $500 and that "he (defendant) run away" is refuted by his own testimony that more than a month later he loaned defendant $2,500 for which he received the above-quoted agreement or note of July 10, 1931. The stock certificate stub purporting to show that the certificate attached thereto was issued June 5, 1931, to "Carlo Migliori, Director" was, to some extent, corroborative of defendant's testimony that the certificate was issued to Migliori. Migliori's statement that he did not receive either the certificate of stock or repayment of the purchase price must be considered in connection with the agreement or note of July 10th whereby defendant and his wife agreed to pay him $2,500 in 90 days.

The books of the corporation probably would have shown whether or not it actually received and used the $480 in question. However, they were not put

in evidence. The prosecution stated that Lowry Nero, an officer of the corporation, and Frances Smith, the officer or employee who appeared to have signed the corporation's receipts for payments made by Migliori, were absent from the State and not available as witnesses. Nearly 13 years have elapsed since the alleged offense took place. The record is quite unsatisfactory and leaves many material facts to inference and conjecture. The complainant's testimony, when considered in connection with the written instruments and facts and circumstances shown by the record, certainly leaves doubt as to the guilt of defendant.

To summarize, the record does not, we believe, support the finding that the $480 in question was delivered to defendant personally, and that he converted it to his own use "with the intent to embezzle, or fraudulently use" the same. With due regard for the determination of the trial court, we conclude that the evidence did not establish defendant's guilt beyond a reasonable doubt.

The judgment should be reversed and a new trial granted.

SHARPE and BOYLES, JJ., concurred with STARR, J.

NORTH, C. J. Mr. Justice STARR has written for reversal and granting a new trial in this case. I am unable to concur in that result.

Defendant, on trial before a judge of the recorder's court of Detroit without a jury, was convicted of the crime of larceny by conversion and sentence imposed. In effect the controlling question presented is whether the testimony was sufficient to sustain the conviction. The trial judge was the trier of the issues of fact involved; and therefore it was within his province to weigh the testimony and to determine what measure of credence should be given to any portion thereof. Unless from the record we

can say that the testimony did not establish defendant's guilt beyond a reasonable doubt, the conviction by the trial court should not be disturbed.

The record discloses a direct conflict between the testimony in support of the prosecution and that offered in behalf of defendant. In substance the information charges that defendant converted to his own use $480 belonging to Carlo Migliori. This sum of money is claimed to have been obtained by defendant incident to a subscription for stock in the United Credit Protection Service Corporation, a Michigan corporation, of which defendant was president. The theory of the prosecution and the claim of Migliori was that defendant after receiving the money did not deliver the stock to Migliori or in any way account for the money defendant had received. Because of there having been another payment of $20 the above-mentioned sum of $480 is sometimes referred to in the record as $500. Migliori testified:

"He (defendant) did not return the $500. I don't see him anymore. He run away. * * * After I give the $500, he didn't give me no stock."

The foregoing testimony was contradicted by defendant; and as a part of his defense he gave testimony of a subsequent transaction incident to which defendant and his wife gave a note to Migliori for $2,500. Defendant claimed the amount of this note was made up of the following items: a loan of $1,500 by Migliori to defendant, repayment by defendant to Migliori of the $500 which defendant is charged in the instant case to have unlawfully obtained, and $500 bonus. But Migliori definitely testified that the note transaction was not a repayment of the money with which he had sought to purchase stock or in any way connected therewith. He testified:

"Q. Is it entirely a different thing?
"A. Different thing."

Incident to the above note transaction defendant testified that the stock certificate which he claimed had been delivered to Migliori was not returned by the latter to defendant, but nonetheless defendant made an entry on the stub of the stock certificate that the same was cancelled.

All of the foregoing transactions occurred in a comparatively short space of time. The first payment by Migliori on the stock subscription was $50, May 14, 1931. A further payment of $430 was made June 5, 1931. The $2,500 note above mentioned was given by defendant and his wife to Migliori July 10, 1931. Shortly thereafter defendant disappeared. Obviously the theory of the prosecution was that defendant by preconceived plan sought to obtain from Migliori as much money as possible.

On behalf of defendant it is urged that the $480 involved in the prosecution was paid to the corporation and not to defendant. This, however, was clearly a question of fact under the testimony. And it is somewhat persuasive that the money was not paid to the corporation but instead was kept by defendant because under the latter's own testimony within a fortnight or so after defendant received the money from Migliori defendant and his wife gave their 90-day note to repay the same money to Migliori. It is hardly conceivable this would have been done if instead of the money having gone to defendant it had gone into the treasury of the corporation. The receipts given to Migliori for the money he paid were marked Exhibits 1 to 3; and defendant testified: "I signed the receipts in evidence, exhibits 1 to 3. They cover the money that was turned over by Mr. Migliori to the cashier."

The instant case is peculiarly one in which there should be adherence to the rule that the function of passing upon credibility of witnesses is in the trier of the facts in the trial court. It is to be presumed

that the trial judge in the instant case was somewhat influenced in gauging the credibility of defendant by the fact that after he left Detroit and before he was apprehended in the instant case, he had been convicted of a felony in another State and had served a penitentiary sentence of five years, and he had also been convicted of obtaining $35 on a check issued without sufficient funds in consequence of which he served a 75-day jail sentence.

In addition to the foregoing defendant's testimony is replete with contradictions. Touching the matter of whether the stock certificate was returned by Migliori to defendant at the time the $2,500 note was given, defendant at first testified: "I told him to keep that (stock certificate) for security." Directly thereafter he testified: "When I gave him that note, I asked Mr. Migliori to return the stock certificate to me and he refused it,—told me not to worry about it." Again in his testimony he testified that when he asked Migliori for the stock certificate: "he told me not to worry about it; that everything was all right. When he received his money he would be glad to return the certificate. I did not tell him to keep it as security."

Further review of the record seems unnecessary. The case is peculiarly one of the type where the trial judge, sitting without a jury, had a distinct advantage in passing upon credibility by reason of his seeing and hearing the witnesses who gave conflicting testimony and observing their attitude and character while on the witness stand. Under the record in this case we should not substitute our judgment for that of the trial court. It is not disclosed that the testimony did not sustain defendant's conviction beyond a reasonable doubt. Defendant's conviction and the sentence imposed are affirmed.

WIEST, BUTZEL, BUSHNELL, and REID, JJ., concurred with NORTH, C. J.